UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

NANCY K. GLOVER,                )
                                )
            Plaintiff           )
                                )
        v.                      )  CAUSE NO: 2:08-cv-262
                                )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,             )
                                )
            Defendant           )


OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the plaintiff, Nancy K. Glover, on September 15, 2008. For the reasons set forth below, the decision of the Commissioner is **AFFIRMED.**

Background

The plaintiff, Nancy K. Glover, applied for Disability Insurance Benefits and Supplemental Security Income on April 26, 2006, alleging a disability onset date of September 1, 2005. (Tr. 142)  Her claim initially was denied on August 29, 2006, and again denied upon reconsideration on December 6, 2006.  (Tr. 74-77, 87-92)  Glover requested a hearing before an Administrative Law Judge ("ALJ") on February 5, 2007.  (Tr. 94)  A hearing before ALJ Denise McDuffie Martin was held on August 30, 2007, at which Glover, medical expert Daryl P. Snyder, Ph.D., and vocational expert Leanne L. Kehr testified. (Tr. 13-52)

On January 25, 2008, the ALJ issued her decision denying benefits. (Tr. 57-73)  The ALJ found that Glover was not under a disability within the meaning of the Social Security Act from September 1, 2005, through the date she issued her decision. (Tr. 73)  Following a denial of Glover's request for review by the Appeals Council, she filed her complaint with this court.

Glover was born on January 11, 1955, making her 53 years old on the date of the ALJ's decision.  (Tr. 73, 142)  She is 5'2" in height and weighs approximately 250 pounds.  (Tr. 573)  She lived independently while she was employed.  (Tr. 145)  After she was let go from her last job in 2005, she moved in with her sister until March 2006.  (Tr. 204, 293)  Then, she moved into a homeless shelter for approximately seven months.  (Tr. 22, 204, 293)  Glover performed community service and chores at the homeless shelter.  (204-05)  In November 2006, Glover moved into a one bedroom apartment through the aid of social services, but she received help with her activities of daily living.  (Tr. 34-35)

Glover was diagnosed with asthma, chronic pulmonary obstructive disease, depression, obesity, urinary incontinence, and hypertension.  (Tr. 339, 341-345, 360-362, 573, 577)  She began seeking treatment at St. Clair Health Clinic in 1999 for asthma, depression, and urinary incontinence.  (Tr. 339, 341-345, 360-362)  Her doctors prescribed medication for these symptoms, which included a nebulizer for home use.  (Tr. 339, 341-345, 361)  Glover was re-evaluated in June 2000 and complained of wheezing. (Tr. 340)  She reported that she had been noncompliant with tak-

ing her medication because she ran out. (Tr. 340) The doctor gave her another inhaler and advised her to continue using it. (Tr. 340)

Glover saw her family practitioner monthly for asthma between July and November 2000. (Tr. 335-338) Her doctor monitored her asthma medications, which included Prednisone, Proventil, Singulair, and a nebulizer, and noted that her urinary incontinence was improved with medication. (Tr. 335-338) On February 13, 2001, Glover's doctor noted that her asthma was stable. (Tr. 334) She continued monthly visits from April 2001 to March 2002, for a variety of reasons including asthma-related symptoms, urinary incontinence, and depression. (Tr. 329-334) The doctors managed her medications over this period. (Tr. 329-334) Around March 2003, she went back to the doctor for refills of her medication and complained of her asthma. (Tr. 327-28) Her medication was re-started. (Tr. 327) Glover's medications were adjusted in November and December of 2003. (Tr. 320-322)

In August 2004, Glover went to the St. Clair Health Clinic because she was unable to breathe. The doctors sent her to the hospital for treatment. (Tr. 318) Again, on May 13, 2005, Glover complained of difficulty breathing, coughing, and wheezing and was prescribed medication. (Tr. 314) An x-ray was taken of her chest that revealed no evidence of acute cardiopulmonary pathology. (Tr. 398-400)

Glover did not receive treatment between June 2005 and April 2006. (Tr. 308) Although she could not have her prescriptions

refilled unless she was re-evaluated, Glover failed to attend any of the appointments she scheduled. (Tr. 308) Glover was admitted to the Saint Margaret Mercy Healthcare Center in April 2006, complaining of chest pain that lasted two days. (Tr. 258) She had an EKG that showed premature atrial complexes, but was otherwise normal. (Tr. 268) She was diagnosed with unspecified chest pain with asthma, prescribed nebulizer treatment and oral steroids, and released to go home. (Tr. 262, 306) Between April and May of 2006, Glover was treated at the St. Clair Health Clinic four more times for asthma, chest discomfort, high blood pressure, and depression. Each time her medications were adjusted and monitored. (Tr. 303-306)

Glover saw a pulmonary specialist on June 27, 2006, for chronic asthma. (Tr. 462) The doctor noted that Glover smoked a quarter of a pack of cigarettes a day and advised her to quit smoking. The doctor also noted that Glover visited the emergency room several times for asthma and was given steroids, which gave her temporary relief, and nebulizer treatments, which were very effective. (Tr. 462) The doctor gave Glover steroids, home nebulizer medication, and other medications. (Tr. 462)

On July 21, 2006, Glover returned to the Saint Clair Health Clinic for treatment for her depression, asthma, and high blood pressure. (Tr. 485) The doctor noted that Glover was breathing with effort, so he changed her medication and gave her additional medication for her breathing difficulties. (Tr. 485) Glover returned on September 20, 2006, complaining of a severe cough

4

that lasted three days despite nebulizer treatments. (Tr. 471)
Glover was diagnosed with acute asthmatic bronchitis and was
given steroids and medication. (Tr. 471) The physician also
took an x-ray that yielded normal results. (Tr. 558) Two days
later, Glover reported that her breathing improved. (Tr. 482)

In September 2006, tumor masses were discovered in both of
Glover's adrenal glands, which were causing pain to her lower
back region. (Tr. 503) In a February 2007 examination, Glover's
physician noted that the adrenal masses required close monitor-
ing. (Tr. 503, 577)

Glover went to Saint Clair Health Clinic again in November
2006, complaining of depression, anxiety, and a rash. (Tr. 578)
At this time, the doctor increased her depression medication.
(Tr. 578)

Glover was reevaluated for high blood pressure in February
2007, and complained of coughing. (Tr. 577) The doctor issued
her a prescription for steroids. (Tr. 577) Glover was reevalu-
ated again on June 5, 2007, and had her blood pressure medication
increased. (Tr. 573) Two weeks later she reported feeling bet-
ter, sleeping well, having no feelings of depression, and was
leaving the house more often. However, she stated that she was
not socializing and had almost no interaction with people. (Tr.
572)

Upon Glover's application for benefits, the administration
had several physicians review and evaluate Glover's condition.
On May 24, 2006, Dr. Jeffrey Karr performed a mental status exam-

ination on Glover at the request of the agency. (Tr. 288-290) Glover was residing at a homeless shelter at this time and described her daily routine at the shelter as including the performance of some community service such as laundry, as well as reading novels, and writing in her journal. (Tr. 288) Glover was dysphoric and tearful during her evaluation, but she did not display any cognitive problems. (Tr. 290) Dr. Karr found Glover's alleged multiple depressive symptoms consistent with her presentation and diagnosed her with Major Depression. (Tr. 295)

Dr. Joseph Pressner reviewed Glover's medical records and prepared an assessment of her psychiatric condition on July 5, 2006. (Tr. 414-427) Dr. Pressner noted that Dr. Karr diagnosed Glover with major depressive disorder but that he did not provide a Global Assessment of Functioning ("GAF") or an opinion. (Tr. 426) Dr. Pressner found that Glover's self-report to Dr. Karr and the report from Glover's homeless shelter did not imply a severely limiting condition. (Tr. 426) Dr. Pressner further found that Glover did not have a severe mental impairment but that she had mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. 414, 424) Joelle Larsen, Ph.D., reviewed and agreed with Dr. Pressner's assessment in December 2006. (Tr. 567)

On July 18, 2006, Dr. Phillip Budzenski performed a physical examination of Glover at the agency's request. (Tr. 431-436) Glover appeared agitated during her examination and asked Dr.

Budzenski for his name several times. (Tr. 433)  Dr. Budzen-ski's examination found that Glover's lungs were clear and there was no evidence of obstruction. (Tr. 433, 436)  He also per-formed a pulmonary function test that revealed a moderate restriction that Dr. Budzenski concluded was likely due to body habitus. (Tr. 435)  Dr. Budzenski noted that Glover was morbidly obese and that because Glover's breathing difficulties resolved with one nebulizer treatment and she had a nebulizer at home, she did not need emergency room care. (Tr. 436)  He stated that Glover could perform no more than medium work until her blood pressure was controlled and that she should avoid climbing stairs and ramps. (Tr. 436)

Finally, Dr. B. Whitley reviewed Glover's records and pre-pared an assessment of her physical abilities on August 28, 2006. (Tr. 444-451)  Dr. Whitley found that Glover could lift 25 pounds frequently, lift 50 pounds occasionally, stand or walk for six hours per workday, and sit for six hours per workday. (Tr. 445)  Dr. Whitley stated that Glover had the ability to balance, stoop, kneel, and climb ramps and stairs. (Tr. 446)  Furthermore, she could crouch and crawl occasionally, but she never could climb ladders, ropes or scaffolds, and should avoid concentrated expo-sure to fumes, odors, dust, gases, and poor ventilation. (Tr. 446, 448)  Dr. M. Ruiz reviewed Glover's records and concurred with Dr. Whitley's assessment in December 2006. (Tr. 568)

At the hearing before the ALJ, Glover testified that she was at a homeless shelter for approximately seven months and moved

into a one bedroom apartment in November 2006. (Tr. 22, 34) She stated that she had no interest in going out, was not social, had decreased energy, and did not leave her apartment. (Tr. 20) Her daily routine included sitting on the back porch during the day with her neighbor, watching television, or doing a word find. (Tr. 22, 24) The assistant that helped Glover's neighbor also performed Glover's household chores and did her dishes, laundry, and grocery shopping. (Tr. 35) Glover did not drive, had trouble sleeping through the night, and experienced difficulty staying focused. (Tr. 21, 23, 28, 31, 35) In particular, she did not read anymore because she could not remember what she previously read and her mind wandered. (Tr. 21, 31) She also testified that in order to follow a conversation she had to focus on the person speaking to her and pay attention. (Tr. 28) She was referred to therapists for her depression, but she did not continue treatment after the first appointment. (Tr. 34)

Glover also testified that she used her nebulizer every day and had not had an asthma attack recently. (Tr. 23) She stated that her urinary incontinence was uncontrollable and that coughing caused her to lose control of her bladder. (Tr. 23) She further testified that she went through "quite a lot of pads" and could not sit for long because she frequently had to use the bathroom because of her bladder problems. (Tr. 23-24, 31) She believed she would need to take unscheduled breaks due to urinary incontinence, and the medications she was prescribed did not provide relief from her urinary incontinence. (Tr. 23-24, 31-32)

Glover said she could sit for an hour and a half at a time and frequently laid down during the day. (Tr. 25) She had a bad left knee and while walking or using stairs her knee might give out suddenly. (Tr. 26) She only could stand for 20 minutes at a time, and in an eight-hour day, she estimated she could stand for a total of two hours. (Tr. 26-27) She could walk a block before she experienced shortness of breath and began sweating. (Tr. 27)

Dr. Daryl P. Snyder, a psychologist, testified at the hearing as a medical expert. He testified that Glover displayed major depression of moderate severity. (Tr. 37) Glover had moderate restrictions on performing activities of daily living, mild difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, and pace. (Tr. 38) Glover would be moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration, and perform at a consistent pace without interruption from her symptoms. (Tr. 38) However, she would have trouble with extended concentration and her productivity might be reduced at some point in the workweek. (Tr. 39-40) Dr. Snyder concluded that Glover would be able to perform unskilled, simple, routine, repetitive work. (Tr. 38) He concluded that her symptoms would moderately interrupt a normal work schedule because she would have moderate limitations in her performance at a consistent pace and the length and number of rest periods would be unreasonable in a workday. (Tr. 38)

Vocational Expert Leanne Kehr was last to testify at the hearing. (Tr. 40) The ALJ posed a series of hypothetical questions. First, the ALJ asked the VE about the existence of jobs for a person of Glover's age, education, and work experience who was limited to light work with the following restrictions: no climbing ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; no work around unprotected heights or moving machinery; no concentrated exposure to pulmonary irritants; and only unskilled, simple, and routine work. (Tr. 44) The VE testified that such a hypothetical individual could perform Glover's past job as cashier. (Tr. 45) Additionally, such an individual could perform other light, unskilled repetitive type positions such as data entry, electronics cleaner (1,700 positions); electronics assembler (4,500 positions); and packager (2,000 positions). (Tr. 45-46) The ALJ's second hypothetical reduced the exertion level from light to sedentary with no mental limitations. (Tr. 46) The VE testified that she could fill the data entry positions, but the "grid is going to apply because of her birthday". (Tr. 46) On cross examination, the vocational expert testified that missing two days a month would preclude employment in cashier type entry level occupations. (Tr. 48, 49) Manufacturing sector positions like electronics assembler, electronics cleaner, and packager required an individual to be on task 90 percent of the time. (Tr. 49)

10

In her decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled. (Tr. 61-62)  In step one, the ALJ found that Glover did not engage in substantial gainful activity since September 1, 2005, her alleged onset date.  (Tr. 62)  At step two, the ALJ found that Glover had severe impairments of asthma, chronic pulmonary obstructive disease, depression, obesity, and hypertension.  (Tr. 62)  At step three, the ALJ found that Glover's impairment did not meet or medically equal one of the listed impairments. (Tr. 63)  The ALJ relied on Glover's medical records and the state agency medical consultants' evaluations in determining that Glover's impairments did not satisfy Listing 3.02, chronic pulmonary insufficiency; Listing 3.03, asthma; and Listing 4.03 hypertensive cardiovascular disease.  (Tr. 63)  The ALJ also found that Glover did not satisfy Listing 12.04, affective disorders, which was consistent with Glover's medical records, the state agency consultants, and the testimony of the medical expert.  (Tr. 63)

In determining Glover's RFC, the ALJ thoroughly discussed all of Glover's symptoms which could be "reasonably consistent with the objective medical evidence" and followed a two-step process, first determining whether there could be a medically acceptable basis for her complaints, and secondly evaluating the "intensity, persistence, and limiting effects of the claimant's symptoms" to determine if they limited her work ability. (Tr. 64) The ALJ also considered alternative kinds of evidence in deter-

11

mining the claimant's RFC.  (Tr. 64)  The ALJ found that Glover
had the residual functional capacity to

> perform light work that does not require
> climbing ladders, ropes or scaffolds or work-
> ing at unprotected heights or around danger-
> ous moving machinery; more than occasional
> balancing, stooping, kneeling, crouching,
> crawling or climbing ramps and stairs; and
> concentrated exposure to dust and fumes.  I
> further find that the claimant has the mental
> residual functional capacity to understand,
> remember and carry out unskilled, simple,
> routine and repetitive tasks; to maintain
> attention and concentration for extended
> periods of time sufficient to perform un-
> skilled tasks; to interact appropriately with
> the general public, supervisors and co-work-
> ers on an occasional basis; and to respond
> appropriately to changes in the work setting.
> Additionally, when considered in conjunction
> with her other impairments, the claimant's
> obesity does not prevent her from performing
> substantial gainful activity at this residual
> functional capacity.

> (Tr. 63-64)

In reaching this RFC determination, the ALJ discussed Glo-
ver's evaluation at St. Clair's Medical Clinic including the
findings that her treatment was mostly reactive and was con-
trolled by medication.  (Tr. 66)  Glover's treating sources or-
dered diagnostic testing to monitor her conditions, the results
of which were within acceptable clinical limits.  (Tr. 66)
Throughout the course of Glover's treatment, there were minimal
changes to her medications and no hospitalizations.  (Tr. 66)
Consistent with Dr. Budzenski's evaluation, Glover testified that
her asthma was controlled by the use of her medication and
nebulizer.  (Tr. 67)  If Glover had been compliant with the pre-

scribed course of treatment, her emergency room visits could have been avoided. (Tr. 67)

Glover's testimony also was considered, most notably the emphasis on her current condition and present activities. (Tr. 65) The ALJ found that Glover's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible because Glover refused treatment and counseling and because she advised consultative examiners that she had no difficulty with the activities of daily living. (Tr. 70) However, the ALJ took Glover's complaints into account to the extent they were supported by objective medical evidence in assessing the RFC. (Tr. 70)

The ALJ stated that the ME's opinion, which was based on his assessment of the claimant at the hearing, was taken into consideration in assessing the RFC, but that nothing in the record supported his opinion regarding Glover's inability to perform work on a sustained basis. (Tr. 70) The ALJ found that this opinion was inconsistent with the report provided by the homeless shelter that indicated a higher level of functioning and psychological ability than Glover's testimony suggested since she was able to perform chores and fulfill the community service requirements. (Tr. 70)

With the RFC determined, at step four the ALJ found that Glover could perform her past relevant work. (Tr. 71) At step five, the ALJ found that considering Glover's age, education, work experience, and RFC, there were a significant number of jobs

available in the national economy that she could perform, including cashier jobs (5,600), electronics assembly jobs (4,500), electronics cleaner jobs (1,700), and packager jobs (2,000). (Tr. 72)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852 (1972)(*quoting Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

14

Disability and supplemental insurance benefits are available only to those individuals who can establish a "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §404.1520, §416.920. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b), §416.920(b). If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c), §416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth

15

step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. §404.1520(e), §416.920(e). However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f), §416.920(f).

Glover raises five challenges to the ALJ's denial of disability benefits. First, she asserts that the ALJ improperly discounted the ME's assessment that the number and length of breaks Glover would be required to take would be unreasonable in a workday. Glover argues that the ALJ dismissed the ME's opinion solely on the grounds that the ALJ believed the ME's opinion was based entirely on his assessment of Glover at the hearing and that the ALJ failed to consider that the ME also reviewed Glover's medical records. In response, the Commissioner argues that the ALJ gave sufficient weight to the ME's opinion and provided an adequate explanation for assigning limited weight to the ME's testimony.

The ALJ is not required to give controlling weight to a non-examining medical expert's opinion. Rather, a non-examining medical expert's testimony is considered opinion evidence that the ALJ must evaluate with the other evidence of record in rendering her decision. 20 C.F.R. §404.1527(f)(2), §416.927(f)(2);

16

SSR 96-6p. In weighing the evidence, the ALJ must make credibility determinations when the evidence conflicts. ***Fenker v. Astrue***, 2010 WL 406061, *15 (N.D. Ind. 2010). In determining the credibility of a medical expert, the ALJ must consider such factors as the support of the evidence of record, the supportability of the opinion evidence, the consistency of the opinion with the record as a whole, the specialization of the expert, and other relevant factors. 20 C.F.R. §404.1527(a)-(e), §416.927(a)-(e); SSR 96-6p. It is not the duty of the court to reweigh this evidence, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Young v. Barnhart***, 362 F.3d 995, 1001 (7th Cir. 2004). Instead, the court reviews the ALJ's decision to determine if she provided a reasonable explanation for the amount of weight she assigned to the opinion. 20 C.F.R. §404.1527(f)(2), §416.927(f)(2); SSR 96-6p.

The ALJ's opinion thoroughly discussed how Glover's limited treatment, daily activities, and treating physicians' opinions were inconsistent with the ME's opinion. The homeless shelter's report, according to the ALJ, established that the number and frequency of breaks Glover would be required to take did not interfere with her ability to work on a sustained basis. The ALJ further explained that the record was devoid of any evidence or explanations from Glover's treating physicians that would limit her ability to work on a sustained basis. The ALJ also explained that Glover refused treatment and told examiners that she had no difficulty with the activities of daily living, indicating her

condition was not as severe as the ME found.  The decision does not state that the ALJ believed the ME's testimony to be based entirely on Glover's testimony, only that the ME testified as such.  Nor did the ALJ find that the ME failed to review Glover's medical records.  The ALJ sufficiently explained how the ME's opinion conflicted with the other evidence of record that she found to be credible, so remand on this basis is denied.

Glover next argues that her claim should be remanded because the ALJ failed to incorporate all of the RFC limitations in the hypothetical she posed to the VE.  Glover's RFC limited her to occasional interaction with the general public, supervisors, and co-workers.  However, the hypothetical the ALJ posed to the VE did not include this limitation.  In response to the ALJ's hypo-thetical that included all of Glover's RFC limitations except occasional interaction, the VE testified that plaintiff could perform her past work as a cashier and fill several positions, including packager, electronics cleaner, and electronics assem-bler.  The DOT provides that the packer, electronics cleaner, and electronics assembler positions involve taking instruction from supervisors with no immediate response required and helping oth-ers, and that interaction with people is not a significant compo-nent of these jobs.

Harmless error prevents the remand of claims that would not affect the outcome of the case.  *Prochaska v. Barnhart*, 454 F.3d 731 (7th Cir. 2006)(applying the harmless error doctrine to deny remand because requiring the ALJ to consider claimant's obesity

would not affect the outcome of the case).  For example, harmless
error applies when the ALJ fails to ask the VE if his testimony
conflicts with the Dictionary of Occupational Titles ("DOT") and
no actual conflict exists between the VE's testimony and the DOT.
*Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009).  This is be-
cause it would be futile to remand a claim where no conflict
exists and to require the VE to testify as such.  *Id*.  *See also*
*Williams-Overstreet v. Astrue*, 2010 WL 431447, *3 (7th Cir. Feb.
8, 2010)(holding same for ALJ's failure to question about con-
flict with DOT listings if there is no actual conflict).

The ALJ's step four analysis may be altered in light of her
failure to include the interaction limitation in her hypothetical
since Glover's past experience as a cashier required more than
occasional interaction.  Even if Glover was incapable of her past
relevant work experience, the analysis continues to step five,
where the ALJ must determine if the claimant is capable of fill-
ing other positions.  If the ALJ finds that the claimant is capa-
ble of fulfilling other positions that exist in the national
economy, she will not be found disabled.  42 U.S.C. §423(d)(2);
20 C.F.R. §404.1520(f), §416.920(f).

At step five, the VE testified that Glover could fill the
positions of packager, electronics cleaner, and electronics as-
sembler.  Since interaction was not a significant part of these
positions, there was no conflict with Glover's RFC.  Thus, re-
manding would be futile because Glover was capable of performing
jobs in the national economy as they were described by the DOT,

and there was no conflict to resolve.  *See Seamon v. Astrue*, 2010 WL 323515, *5 (7th Cir. Jan. 29, 2010)(holding that ALJ's failure to question VE about conflict with DOT as harmless error).  Moreover, Glover did not challenge the VE's assertion that she was capable of performing these jobs, and so the ALJ was entitled to rely on the VE's assertion.  *Zblewski v. Astrue*, 302 F.App'x 488, 494 (7th Cir. 2008)("[The claimant] did not challenge that assertion at his hearing, and an ALJ is entitled to rely on unchallenged VE testimony.")(*citing Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004); *Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir. 2002)).

Third, Glover asserts that the ALJ failed to determine whether the VE's testimony was reliable before relying on it to support her opinion.  The DOT discusses jobs according to the reasoning function of the job, ranging from a low of one to a high of six.  Glover's past relevant experience as a cashier has a reasoning level of three, which requires the individual to be able to carry out instructions furnished in written, oral, or diagrammatic form and the ability to deal with problems involving several concrete variables. The VE testified that Glover's past work as a cashier could be performed by someone who was limited to performing simple tasks, as Glover was.  However, Glover argues that since her RFC limits her to "simple" tasks, she was restricted to level one jobs, which require "simple" one- or two-step instructions, and that she was unable to carry out her past relevant job as a cashier.  Given this discrepancy, Glover con-

cludes that the ALJ was required to question the VE about the inconsistencies in her testimony. However, the Commissioner argues that the ALJ only was required to ask if an inconsistency existed, and if there was no apparent conflict, she satisfied her duty.

The regulations permit the ALJ to rely on the VE's testimony when determining whether there is work available for the claimant. 20 C.F.R. §404.1566(d), (3). However, SSR 00-4p requires the ALJ to inquire into and resolve apparent conflicts. SSR 00-4p provides in relevant part:

> When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

The primary focus of this inquiry is "whether a conflict is apparent *at the time of the hearing,* and not afterwards." ***Stark v. Astrue***, 278 F.App'x 661, 667 (7th Cir. 2008); ***Tolbert v. Astrue***, 2008 WL 4449557, *5 (N.D. Ind. 2008). The ALJ satisfies her duty by inquiring on the record if a conflict exists. ***Stark***, 278 F.App'x at 667. If the VE states that his testimony is consistent with the DOT, the ALJ is not required to inquire further at this step. *Id.* The burden then shifts to the claimant's attorney to raise inconsistencies at the hearing. *Id.;* ***Tolbert***, 2008 WL 4449557, at *5. The claimant is given the opportunity to iden-

tify conflicts and question the VE in regard to those conflicts. *Stark*, 278 F.App'x at 667. The claimant cannot wait to raise the conflict after the hearing, because the focus of the inquiry is on whether the conflict was apparent at the time of the hearing. *Tolbert*, 2008 WL 4449557, at *5.

Here, the ALJ asked the VE whether her testimony was consistent with the DOT, to which she responded it was consistent. The ALJ was permitted to rely on the VE's assurance, shifting the burden to identify conflicts to Glover's counsel. During his examination, Glover's counsel failed to identify any inconsistencies with the DOT. Therefore, the ALJ satisfied her duty by inquiring into conflicts between the DOT and VE's testimony, and Glover cannot now point to inconsistencies she failed to raise at the hearing. *See Zblewski*, 302 F.App'x. at 494 (holding same).

Fourth, Glover argues she would be unable to perform the electronics assembler, electronics cleaner, and packager positions consistent with her mental limitations because her forgetfulness would prevent her from staying on task 90 percent of the time, as the positions identified by the VE require. Glover supports her position by pointing to the mental examination by Dr. Karr where she was unable to remember two out of three items after a five minute period, the report from the shelter regarding her forgetfulness in performing errands, and by again arguing that the ALJ improperly discounted the ME's opinion.

In her opinion, the ALJ thoroughly discussed Glover's daily activities, limited treatment history, the opinions of medical

sources, and other evidence of record to support her decision. In fact, Dr. Karr's mental status examination also concluded that Glover was a quick-study, without any apparent cognitive concerns, and that she was capable of handling funds. (Tr. 296) Therefore, the very report Glover complains was not adequately discussed supports the ALJ's decision that Glover was capable of performing work despite her occasional forgetfulness.

The ALJ was not required to address every piece of evidence of record. *Rice*, 384 F.3d at 370. Rather, she only was required to build a logical bridge from the evidence to her conclusion. *Id*. at 369. Here, the ALJ did this by thoroughly discussing Glover's daily activities and the opinions of medical sources that concluded that she was capable of performing unskilled, routine work. In fact, none of the medical opinions stated that Glover was unable to perform such tasks. Even the ME's opinion that Glover complains the ALJ improperly discounted, concluded that she was capable of performing unskilled, simple, routine work given her mental limitation. Accordingly, it was unnecessary for the ALJ to discuss all of the evidence, including Dr. Karr's examination and the shelter's report, because the ALJ satisfied her duty by explaining the medical opinions and Glover's daily activities and concluding that, based on all of the evidence, Glover was capable of performing unskilled, simple, and routine work.

Finally, Glover argues that the ALJ improperly determined that her symptoms were "not entirely credible" and that, based

23

upon this belief, the ALJ gave inappropriate weight to the severity of her symptoms.  This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record.  ***Schmidt v. Astrue***, 496 F.3d 833, 843 (7th Cir. 2007).  *See also* ***Prochaska,*** 454 F.3d at 738 ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.").  The ALJ's "unique position to observe a witness" entitles her opinion to great deference.  ***Nelson v. Apfel***, 131 F.3d 1228, 1237 (7th Cir. 1997).  *See also* ***Allord v. Barnhart***, 455 F.3d 818, 821 (7th Cir. 2006).  However, if the ALJ has not made explicit findings and has not explained them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference.  ***Steele v. Barnhart***, 290 F.3d 936, 942 (7th Cir. 2002).  Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision."  ***Clifford v. Apfel***, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering the "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. §404.1529(a); ***Arnold v. Barnhart***, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be

accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." 20 C.F.R. §404.1529(c). *See also Schmidt*, 395 F.3d at 746-47 ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1; *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a signifi-
> cant factor of his or her alleged inability
> to work, the ALJ must obtain detailed
> descriptions of the claimant's daily activi-
> ties by directing specific inquiries about
> the pain and its effects to the claimant. She
> must investigate all avenues presented that
> relate to pain, including claimant's prior
> work record, information and observations by
> treating physicians, examining physicians,
> and third parties. Factors that must be con-
> sidered include the nature and intensity of
> the claimant's pain, precipitation and aggra-
> vating factors, dosage and effectiveness of
> any pain medications, other treatment for
> relief of pain, functional restrictions, and
> the claimant's daily activities. (internal
> citations omitted)

> *Luna v. Shalala,* 22 F.3d 687, 691 (7th
> Cir.1994)

When the ALJ discounts the claimant's description of pain

because it is inconsistent with the objective medical evidence,

she must make more than

> a single, conclusory statement . . . . The
> determination or decision must contain spe-
> cific reasons for the finding on credibility,
> supported by the evidence in the case record,
> and must be sufficiently specific to make
> clear to the individual and to any subsequent
> reviewers the weight the adjudicator gave to
> the individual's statements and the reasons
> for that weight.

> SSR 96-7p, at *2

*See also* *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995)

(finding that the ALJ must articulate, at some minimum level, her

analysis of the evidence). She must "build an accurate and logi-

cal bridge from the evidence to [her] conclusion." *Zurawski v.*

*Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (*quoting* *Clifford*, 227

F.3d at 872). When the evidence conflicts regarding the extent

of the claimant's limitations, the ALJ must examine the evidence both favoring and rejecting the claim of pain. *See Zurawski*, 245 F.3d at 888 (*quoting Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined,* since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis added in *Zurawski*).

The existence of symptoms and diagnoses does not require an ALJ to find that a claimant suffers from a disabling impairment. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (stating that the existence of symptoms and diagnoses does not require the ALJ to find that a claimant suffers from a disabling impairment in light of the ability of the claimant to function when symptoms are controlled by medication and treatment). An ALJ may conclude that a person has a history of impairments but that the impairment was not so severe as to be disabling, especially in light of the claimant's ability to function when undergoing treatment or medication management. *See Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir. 2007) (*citing Barrientos v. Sec'y of Health and Human Services*, 820 F.2d 1, 2 (1st Cir. 1987) (finding that the medical evidence established that claimant's symptoms were largely controlled by medication and treatment); *Higgs*, 880 F.2d at 863 (holding that a disability does not have to be recognized if the symptoms and diagnoses do not prevent the claimant from being able to function when on medication or receiving treatment).

In support of her claim, Glover argues that the ALJ's credibility determination was flawed because the ALJ failed to consider her reasons for missing scheduled appointments, the ALJ's finding of non-compliance with her medication was speculative, and the ALJ placed too much emphasis on the errands she did at the homeless shelter and did not consider her activities once she moved into an apartment.

An ALJ must consider explanations the individual provides for failing to pursue regular medical treatment. SSR 96-7p. However, the claimant's statements may be found less than credible if "the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7p. Glover explained that her absences from her scheduled appointments were due to relocating to the homeless shelter and not having transportation. Therefore, Glover contends that the ALJ should not consider the lack of treatment in her decision. In her decision, the ALJ not only considered Glover's absences from her scheduled appointments, but she also took into account the reports from her physicians that she was non-compliant with her medication and the opinions of the treating physicians that she would not have needed emergency room care if she used her medication. Furthermore, the ALJ stated that Glover's medical history was relatively limited, so that the level and frequency of treatment did not coincide with her complaints. Therefore,

even if Glover had an adequate reason for missing her scheduled appointments, her limited medical history and history of non-compliance that extended beyond the time she resided at the home-less shelter were without explanation and support the ALJ's cred-ibility determination.

Glover also argues that the ALJ's finding that she was non-compliant with her medication was speculative and was not evi-dence the ALJ could rely on in issuing her credibility determina-tion.  An ALJ's credibility determination will be found specula-tive when there is an absence of substantial evidence in the record.  *White v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999).  Sub-stantial evidence means that there is enough evidence that a reasonable mind might accept as sufficient to support a conclu-sion.  *Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992).  Here, Glover reported to her phy-sician that she had been non-compliant with taking her medica-tion.  (Tr. 340)  Dr. Budzenski also noted that she was non-com-pliant, had unopened medications, and six-month-old unused pre-scriptions.  (Tr. 435-36)  Furthermore, Dr. Budzenski stated that Glover did not need to seek emergency room care because her symp-toms could have been treated by one nebulizer treatment, which Glover failed to do.  (Tr. 436)  Based on the foregoing, the ALJ was entitled to conclude that Glover was non-compliant.  There-fore, adequate evidence of record supports the ALJ's finding that Glover was non-compliant, and her conclusion was not speculative.

Glover also argues that the ALJ failed to consider her daily activities once she moved out of the homeless shelter. However, the ALJ did discuss Glover's activities once she moved into her apartment. The ALJ noted that her neighbor's caretaker helped her perform daily activities and that she no longer drove or wanted to leave the house. Furthermore, an ALJ can consider reported activities and part-time employment in determining what activities the claimant is capable of performing, so the ALJ did not err in discussing only Glover's activities at the homeless shelter. *See* 20 C.F.R. §404.1529(c)(3); §416.929(c)(3); SSR 96-7p.

The ALJ's credibility determination was made in light of the record as a whole. She thoroughly discussed Glover's limited treatment history, normal test results, refusal to seek further treatment by a mental health specialist, and her personal testimony regarding the relief she experienced from nebulizer treatments. Since the court will not overturn an ALJ's credibility determination unless it is "patently wrong" and not supported by the record, and here the ALJ thoroughly discussed her conclusion, her credibility determination must stand. *See **Schmidt***, 496 F.3d at 843 ("[W]e will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong.").

———————————

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED.**

ENTERED this 16th day of March, 2010


                            s/ ANDREW P. RODOVICH
                               United States Magistrate Judge